UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Laurel Hill Paper Company, | ) | Case No. 07-10187C-11G |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| All Points Capital Corp., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 07-2040 |
| | ) | |
| Laurel Hill Paper Company, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

This adversary proceeding came before the court on March 31, 2008, for the trial of the issues related to whether the claimants in this proceeding who are asserting statutory liens pursuant to Chapter 44A of the General Statutes of North Carolina have a perfected lien against any of the proceeds realized from the assets sold by the Debtor, Laurel Hill Paper Company, in May of 2007. Having considered the evidence offered during the week-long trial, the arguments of counsel and the post-trial briefs submitted by the parties, the court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure.

JURISDICTION

The court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(K) which this court may hear and determine.

BACKGROUND

On February 13, 2007, Laurel Hill Paper Company ("Debtor") filed a petition in this court seeking relief under chapter 11 of the Bankruptcy Code. The assets of the Debtor included a manufacturing facility located in Cordova, North Carolina. On May 17, 2007, an order was entered granting the Debtor's motion for approval of the sale of the Cordova facility at a price of $22,700,000. On May 29, 2007, the sale of the Cordova facility closed and the Debtor received net proceeds of $21,965,868.27.

The assets that were sold pursuant to the May 17, 2007 order consisted of the Cordova real estate and buildings, the machinery and equipment at the Cordova facility, the inventory, spare parts and supplies located at the Cordova facility and various vehicles and trailers owned by the Debtor. At the time of the sale, the assets that were sold were subject to various alleged liens and encumbrances, which were transferred to the sale proceeds by the order authorizing the sale. There were some fifteen entities that

held or claimed liens or security interests with respect to one or more of the assets that were sold. The parties to this proceeding include the various entities who claim they are entitled to a portion of the sale proceeds based upon their lien or security interest having been transferred to the sale proceeds. The relief sought in this proceeding is a determination of the priority, extent and value of the liens and encumbrances that were transferred to the sale proceeds.

The Claimants who are asserting statutory liens are American Stainless & Supply, LLC ("American Stainless"), Mechanical Supply Company ("Mechanical Supply") and Superior Cranes, Inc. ("Superior") (the "44A Claimants"). The 44A Claimants contend that they performed labor or furnished materials for improvements at the Cordova facility for which they have not been paid and that each has a lien that secures their unpaid balances pursuant to Chapter 44A of the General Statutes of North Carolina. In addition to claiming a lien against the proceeds from the Cordova real estate, the 44A Claimants contend that their liens also extended to a portion of the machinery and equipment at the Cordova facility and that they are entitled to the proceeds from such machinery and equipment, as well.

There are other parties to this proceeding who also claim to have a lien or security interest in the same items of machinery and equipment based upon having perfected a security interest pursuant

- 3 -

to Article 9 of the Uniform Commercial Code as adopted in North Carolina.  Based upon their Article 9 security interests, these claimants maintain that they, not the 44A Claimants, are entitled to the proceeds realized from the items of machinery and equipment in question.[1]

                              FACTS

      The Debtor purchased the Cordova real estate in 1982.  The site had been a textile mill and contained no paper making equipment when acquired.  Over the next two years, the Debtor purchased and installed the equipment required in order to manufacture tissue paper and napkins at the facility.

      The raw material used by the Debtor consisted of used paper products such as newspaper rather than virgin wood fiber.  The manufacturing process employed by the Debtor involved converting the paper products into a watery mush referred to as pulp, cleaning the pulp and then feeding the pulp into the paper making machine which converted the pulp into tissue-type paper.

      Nearly all of the equipment that the Debtor installed at the facility was used equipment.  The used equipment installed by the

---

      [1]If the 44A Claimants are successful in establishing a 44A lien against the proceeds from any of the items of machinery and equipment that were sold, a conflict will arise between the 44A Claimants and the Article 9 claimants who hold a security interest with respect to those items of machinery and equipment.  If 44A liens are established, questions related to the priority of such liens vis-a-vis the liens held by other parties will be addressed at a later hearing after notice to all interested parties.

                              - 4 -

Debtor included a very large Beloit machine that made the tissue paper manufactured at the Cordova facility and various items of equipment for making and cleaning the pulp. At a later time, the Debtor installed converting equipment at the Cordova facility which enabled the Debtor to convert the large parent rolls of paper that came off the paper making machine into smaller rolls of paper.

In approximately 2002, the Debtor began planning for a possible expansion at the Cordova facility in order to increase the manufacturing capacity of the facility. In late 2004 or early 2005, the Debtor decided to proceed with the expansion. At that time, the Debtor still had only one paper-making machine, the Beloit machine. The expansion involved purchasing and installing another paper making machine and certain ancillary equipment.

Even before selecting the additional paper making machine, the Debtor had begun purchasing and accumulating various used parts and components that would be required in order to install an additional paper machine and continued to do so after the selection was made. Although the Debtor had investigated and considered the purchase of a used paper making machine, the decision was made to purchase a new machine from Metso Paper USA, Inc. known as a Metso DCT 100 ("the Metso").

Prior to undertaking the installation of the new paper machine, the Debtor made extensive improvements to its real estate in Cordova. The Debtor determined that the new machine could not

be installed in the existing plant and that a new building would have to be constructed for the machine. However, the Cordova site did not have enough vacant land for the erection of a new building. It therefore was necessary to convert a marshy area on the property into solid ground. This work consisted of moving and compacting a significant amount of fill dirt onto the marsh. Once the site work was completed, the Debtor then had a new building constructed on the site that had been prepared. None of the 44A Claimants had any role or contemplated having any role in this work and it was only after this work was completed that the 44A Claimants had any involvement.

The Metso was ordered in April of 2005 at a cost of $7,745,000. The Metso was manufactured in Sweden and had to be shipped by sea to the United States. Because of the large size of the machine, it could not be shipped in one piece. Instead, various parts of the machine were packed in containers and transported by ship to the United States. After arriving at the port in Charleston, South Carolina, the containers were delivered to the Cordova facility by trailers that were left at the Cordova facility with the containers in place on the trailers.

At the point at which the 44A Claimants became involved, the site preparation and building construction were complete and the project envisioned and contemplated at that time was the installation of the new paper machine and some upgrading of

ancillary machinery.  Because of the size and weight of the Metso, cranes and rigging equipment were required in order to remove the shipping containers from the trailers, remove the machine components from the containers and move the machine components into the new building so that the machine could be assembled.  Once the Metso was assembled, various connections were required in order for the machine to operate and manufacture paper, such as connections to electricity, steam and the equipment that prepared the pulp. Superior was involved in the moving, assembly and installation of the Metso and, later, performed work related to other machinery and equipment at the Cordova facility.  American Stainless supplied a portion of the stainless steel piping required for connecting the various equipment and sources of steam, while Mechanical Supply supplied some of the valves utilized in the piping installed at the facility.

## ANALYSIS

In asserting that they hold perfected liens, the 44A Claimants rely upon Article 2 of Chapter 44A of the General Statutes of North Carolina.  The portion of Article 2 that is applicable in this proceeding is Part 1 which deals with liens of claimants who deal with the owner of real property.  See N.C. Gen. Stat. §§ 44A-7 through 44A-16.

The description of the persons or entities eligible to obtain a 44A lien against real property is contained in N.C. Gen. Stat.

- 7 -

§ 44A-8, which, in pertinent part, provides:

> Any person who performs or furnishes
> labor . . . or furnishes materials . . .
> pursuant to a contract, either express or
> implied, with the owner of real property for
> the making of an improvement thereon shall,
> upon complying with the provisions of this
> Article, have a right to file a claim of lien
> on real property on the real property to
> secure payment of all debts owing for labor
> done . . . or material furnished . . .
> pursuant to the contract.

The requirements under section 44A-8 are that the claimant have either an express or implied contract with an owner of real estate, the contract must provide for services and/or materials to be provided by the claimant for the making of an improvement on the real property and the claimant must supply services and/or materials pursuant to the contract. A claimant who meets these requirements, upon complying with the provisions of Article 2, has a right to file a "claim of lien on real property" with respect to the real property improved by the services and/or materials provided by the claimant pursuant to the contract with the owner.

When the Cordova facility was sold, the land and buildings were subject to deeds of trust held by Richmond County and First Scotland Financial, LLC. These deeds of trust were recorded and in place before any work or materials were supplied by the 44A Claimants and admittedly have priority over any 44A liens that may be established by the 44A Claimants. It also is undisputed that the indebtedness secured by these deeds of trust exceeds the amount

- 8 -

of proceeds that are allocable to the land and buildings. As a result, even if 44A liens are established, such liens will not entitle the 44A Claimants to any of the sale proceeds unless they are able to show that they are entitled to proceeds that are allocable to machinery and equipment located in the Cordova facility at the time of the sale.

Of the various machinery and equipment that were located in the Cordova facility, the 44A Claimants have singled out the Metso and certain pulp preparation and deinking equipment as the equipment and machinery that they say is subject to the 44A liens asserted by them. von Drehle Corporation ("von Drehle"), as assignee of General Electric Credit Corporation ("GE Credit"), claims a first priority purchase security interest in the Metso and Siemens Financial Services, Inc. ("Siemens") claims a first priority purchase money security interest in the pulp preparation and deinking equipment singled out by the 44A Claimants (hereinafter referred to as the "Siemens Collateral"). The Siemens Collateral consists of various items of pulp preparation equipment, the original paper making equipment, various items of air handling/boiler house equipment, certain items of lab equipment and certain items of ink room equipment, all of which are described in detail in Debtor's Exhibit No. 20. Both von Drehle and Siemens, as well as the Debtor and Committee of Unsecured Creditors ("Committee"), oppose the claims asserted by the 44A Claimants.

While it is not disputed that the 44A Claimants supplied materials and/or services at the Cordova facility pursuant to some type of contract, there is a dispute regarding what type of contracts they had and whether such contracts were the type of contracts required under N.C. Gen. Stat. § 44A-8, i.e., a contract for an improvement on real property. There also is a dispute regarding whether the contracts of the 44A Claimants were single, continuing contracts with the Debtor or whether the contractual relationship was one in which the shipments were not continuous and connected such that there was a series of separate contracts. This latter dispute is critical in determining whether the 44A Claimants filed their notice of claim of liens within 120 days after the last furnishing of labor or materials as required under N.C. Gen. Stat. § 44A-12.

I.  Are the Metso and the Siemens Collateral
    Improvements on Real Property?

Section 44A-8 requires that a lien claimant furnish labor or materials pursuant to a contract with the owner of real property "for the making of an improvement" on such real property. N.C. Gen. Stat. § 44A-8. Therefore, if the Metso and the Siemens Collateral do not constitute an improvement on real property, the 44A Claimants did not furnish labor or materials pursuant to a contract "for the making of an improvement" and they are not entitled to a lien under section 44A-8. Thus, in determining whether the 44A Claimants are entitled to a lien, the first issue

- 10 -

that must be resolved is whether the Metso or the Siemens Collateral constitute an improvement on real property. The starting point for this determination is section 44A-7 which provides:

> "Improvement" means all or any part of any building, structure, erection, alteration, demolition, excavation, clearing, grading, filling, or landscaping, including trees and shrubbery, driveways, and private roadways, on real property.

N.C. Gen. Stat. § 44A-7. Under this definition, in order to be an "improvement," the Metso and Siemens Collateral must be part of the building in which they were installed. To determine if the Metso and the Siemens Collateral are part of the building in which they were installed and hence improvements on real property, the court turns to the law of fixtures. <u>Little v. Nat'l Services Indus., Inc.</u>, 340 S.E.2d 510 (N.C. App. 1986) (examining the law of fixtures to determine if a chairlift was an improvement to real property for purposes of a statute of repose). "'A fixture has been defined as that which, though originally a moveable chattel, is, by reason of its annexation to land, or association in the use of land, regarded as part of the land, partaking of its character . . . .'" <u>Wilson v. McLeod Oil Co., Inc.</u>, 398 S.E. 2d 586, 598 (N.C. 1990) (citing <u>Little v. Nat'l Services Indus., Inc.</u>, 340 S.E.2d 510, 513 (N.C. App. 1986) (quoting 1 <u>Thompson on Real Property</u>, 1980 Replacement, § 55, at 179 (1980)).

Several tests for determining whether personal property

- 11 -

becomes real property once annexed to land exist and are as follows: (1) the manner in which the article is attached; (2) the nature of the article and the purpose for which it is attached; and (3) the intention with which the annexation of the personal property is made. Id. North Carolina follows the general rule that the controlling test for determining whether personal property has become real property is the intention of the contracting parties at the time of annexation. Lee-Moore Oil Co. v. Cleary, 245 S.E.2d 720, 722 (N.C. 1978) ("Whether a thing attached to the land be a fixture or chattel personal, depends upon the agreement of the parties, express or implied."). The other tests are utilized to determine the intent of the parties at the time of annexation if no other competent evidence of intent exists. See id.; James A. Webster, Jr., Webster's Real Estate Law in North Carolina, § 2-1 (4th ed. 1994).

When an owner of real property annexes personal property to such real property, a presumption arises that the owner intended the personal property to become part of the realty, thereby transforming the personal property into real property, making it a fixture. Little v. Nat'l Services Indus., Inc., 340 S.E.2d 510, 513 (N.C. App. 1986); Wilson, 398 S.E. 2d at 599 ("'[W]hen additions are made to the land by the owner, it is generally viewed that the purpose of the addition is to enhance the value of the land, and the chattel becomes a part of the land.'").

The burden of rebutting the presumption is on the party asserting that the annexed personal property was not intended to become part of the real estate, and, therefore, did not become a fixture. Little, 340 S.E.2d at 514. The pertinent evidence in rebutting the presumption is evidence of the parties' intentions at the time the personal property was annexed to the land and includes the terms of the contract between the parties, the actions of the parties while the contract was in effect, and the actions of the parties at the termination of the contract. Wilson, 398 S.E.2d at 599.

In the case at bar, the Debtor, the owner of the equipment in question, installed the equipment in a building owned by Debtor. Most of the evidence regarding the installation of the equipment focused on the Metso and showed the manner in which the Metso was installed. The evidence regarding installation of equipment included within the Siemens Collateral, however, was very limited and, in fact, no credible evidence regarding installation was offered regarding most of the Siemens Collateral. There was some evidence regarding the installation of pulpers 3 and 4, a Mega cell, deinking cells and a decker. As to these items and the Metso, there is a presumption that the Debtor intended for such items to become fixtures.[2] Because they are asserting that the

---

[2] As to the rest of the equipment that is part of the Siemens Collateral, the 44A Claimants are not entitled to a lien because of a lack of evidence as to such equipment.

- 13 -

equipment in question remained personal property and did not become fixtures, the Debtor and the other parties opposing the 44A Claimants must overcome such presumption by competent evidence showing that the Debtor intended that the Metso and the Siemens Collateral remain personal property at the time they were installed.

The best evidence of the Debtor's intention at the time of annexation is a written agreement between the Debtor and a third party that speaks to this issue. Wilson, 398 S.E.2d at 586; Rothermich v. Union Planters Nat'l Bank, 10 S.W.3d 610, 615 (Mo. Appl. E.D. 2000) (stating that where "the intention of the parties may be determined from their contract, such intention should control, regardless of other tests and rules of law which are applied in determining the question in the absence of the expressed intention of the parties").

The evidence in this proceeding includes the promissory note and security agreement that were executed by the Debtor when the Siemens Collateral was purchased by the Debtor. The security agreement specifically provides that the collateral "is and will remain personal property" and further provides that in the event of a default by the Debtor, the secured party is authorized "to enter any premises where the Collateral or any part thereof is, or may be, placed, and to assemble and/or remove same and/or to render it unuseable and sell, lease, license or otherwise dispose of such

- 14 -

Collateral." This language reflects that at the time the equipment was installed, the Debtor understood and intended that the equipment was to remain personal property rather than becoming part of the building, would not necessarily remain in the building permanently and could be disconnected and removed by the creditor if a default occurred. The same is true regarding the Metso, as reflected in the promissory note and security agreement between the Debtor and GE Credit. The GE Credit security agreement provides in subsection (c) of paragraph 7 entitled "Default and Remedies" that GE Credit may "enter any premises where the Collateral may be and take possession of and remove the Collateral from the premises." Subsection (c) further provides that, upon default and at the request of GE Credit, "Debtor shall promptly assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties."

These provisions in the security agreements show that the Debtor understood that the Metso and the Siemens Collateral were subject to being removed, repossessed, and installed elsewhere if the Debtor defaulted. These documents are strong evidence that the Debtor did not intend for the Metso or the Siemens Collateral to become part of the building in which they were installed and were not installed to enhance the value of the building or land.

Additional evidence of the Debtor's intention was supplied

- 15 -

through the testimony of Kent Hogan, the president of the Debtor. Mr. Hogan testified extensively about his intentions at the time the disputed equipment was installed.   Mr. Hogan, as president, made all of the financial decisions for the Debtor, including the decision to purchase and install the Metso and Siemens Collateral in the building located in Cordova.   A review of some of the background information on the Debtor and Mr. Hogan is helpful in understanding the weight given his testimony.   The Debtor became involved in the paper-making industry in 1982 when it purchased the Cordova facility from Burlington Industries.   Prior to that time, the Cordova facility had been a textile mill; the Debtor modified the building and installed a used paper-making machine.   Mr. Hogan was the president and major stockholder of the Debtor at this time. Even at this early date in the Debtor's history, its principal officer understood that there was a market for used paper-making machines and parts and that even though such equipment was very large and difficult to install, it was feasible to remove, transport and install such equipment at another location.   In 2002, the Debtor began to think seriously about installing another paper-making machine at the Cordova facility in order to add capacity to the operation.   The Debtor began looking in the used machinery market, but at that time there was not a used paper machine that had a crescent former headbox, so the Debtor began looking at new

- 16 -

machines.[3]  The Debtor agreed to purchase the Metso in 2005.  Mr.
Hogan was the one who made this decision on behalf of the Debtor,
and he is the one who signed all the documents related to the
purchase and financing of the Metso and Siemens Collateral.  As
such, he is qualified to speak of the Debtor's intentions at the
time of the installation of the Metso.  Although his testimony
reflects that at the time of installation, the Debtor planned for
the Metso to remain in Debtor's plant indefinitely, his testimony
also reflects that he had always thought of the Metso as just a
machine and that he never thought that the Metso would become part
of the building or the land on which it was installed.  In
addition, he testified that the financing for the Metso and the
Siemens Collateral was secured with liens that were perfected by
UCC-1 financing statement filings with the North Carolina Secretary
of State, while the financing for the building in which the Metso
was installed was perfected through a Deed of Trust.  In his
experience, Mr. Hogan understood that deeds of trust are used for
real property, such as land and buildings, while UCC-1 financing
statements are used for personal property such as equipment.  The

---

[3]In the 1970s there was a change in technology in the headbox
of a paper machine.  Prior to the 1970s, all paper machines were
equipped with a fourdrinier headbox where a thin sheet of paper is
formed under pressure onto a moving nylon bar.  The newer paper
machines are made with a crescent former headbox which is a much
simpler apparatus that requires less adjustments than a fourdrinier
headbox.  In addition, the crescent former headbox produces a more
uniform sheet with better characteristics, such as greater
strength.

- 17 -

evidence established that Mr. Hogan understood the difference between real property and personal property and that he understood and intended that the financing of the Metso and the Siemens Collateral meant that if a default occurred the equipment would be treated as personal property.  He also understood and intended that if a default occurred, the secured parties would have the right to remove that equipment, and would be able to do so, in order to sell the equipment pursuant to the security agreements.  After the installation was completed, the Debtor and Mr. Hogan continued to treat the Metso and the Siemens Collateral as personal property when they had the Metso and Siemens Collateral appraised separately from the appraisal that was done regarding the land and buildings. Taken as a whole, the evidence is sufficient to overcome the presumption that the Debtor intended for the Metso and the Siemens Collateral to become part of the real estate.  However, this is not the end of the inquiry because further analysis is required in order to determine whether the subjective intent of the Debtor and the secured parties should be considered in resolving a dispute involving the 44A Claimants.

Under the North Carolina cases, "[w]here the controversy is between parties connected to the transaction in some manner, as in a controversy between the owner of the land and the one who annexed the [personal property], the subjective intent of the parties as evidenced by their words, conduct, or agreements, express or

implied, is the relevant intent." <u>Little</u>, 340 S.E.2d at 513. However, "[w]hen the rights of a third party, who is unconnected to the land or the original transaction involving the annexation of the chattel, are concerned, the question is how the intent of the parties to the transaction is manifested to the third party through 'physical facts and outward appearances.'" <u>Wilson v. McLeod Oil Co., Inc.</u>, 398 S.E.2d at 599 (quoting <u>Little v. Nat'l Services Indus., Inc.</u>, 340 S.E.2d 510, 513 (N.C. App. 1986)). "In such a case, the annexor's intent is ascertained from such external indicia as the relationship of the annexor to the land . . ., the nature of the chattel attached and its relationship or necessity to the activity conducted on the land, and the manner in which the chattel is attached." <u>Little</u>, 340 S.E.2d at 513. The distinction made in <u>Little</u> thus appears to turn on whether the third party is connected in some manner to the land or transaction being examined.

In <u>Little</u>, the North Carolina Court of Appeals had to decide whether a chairlift utilized to transport visitors from a parking lot to a park located on top of a mountain was an "improvement to real property" for purposes of a statute of repose. 340 S.E.2d at 512. The plaintiff was a patron of the park who was injured by the chairlift some seven years after it was installed. Because the plaintiff obviously had no connection to the transaction involving the installation of the chairlift seven years earlier, the court held that an objective standard was applicable in determining

whether the owner of the park intended for the chairlift to remain personal property.  Using an objective standard, the Court of Appeals found that the chairlift was an improvement to real property because from all outward appearances it seemed that the chairlift was meant to be part of the real estate despite the evidence of a contrary intent introduced by the owner of the chairlift.  Id. at 514.

The situation in this proceeding is very different from the situation in Little.  Unlike the plaintiff in Little, the 44A Claimants are not strangers to the transaction involving the acquisition and installation of the Metso and the Siemens Collateral.  Recognizing that one of the requirements under section 44A-8 is that the claimant understand and intend that the materials or labor supplied are going into an improvement on real property, the 44A Claimants assert that they had such an understanding and intent.  If such an understanding and intent existed, it necessarily would mean the 44A Claimants were aware that the improvement involved the installation of extensive and expensive additional equipment and that such additional equipment, both new and used, had been or was being acquired by the Debtor for installation at the Cordova facility.  Each of the 44A Claimants was aware and directly involved in the project involving the installation of the additional equipment by either supplying materials that were used in making the installation or, in the case

of Superior, actually performing work at the project site.   There were direct and frequent communications between representatives of the Debtor and representatives of the 44A Claimants regarding the project.   It is true that the 44A Claimants were not parties to the agreements between the Debtor and GE Credit and Siemens.   However, the decision in <u>Little</u> does not limit the admissibility of the subjective intent to the parties to a contract or transaction.   All that is required is that the third party be connected in some manner to the agreement or transaction.   The court is satisfied and finds that the 44A Claimants were connected sufficiently to the agreements and transactions between the Debtor and GE Credit and Siemens such that the intent of those parties regarding the status of the Metso and the Siemens Collateral may be considered in determining whether such equipment became fixtures.

An additional reason that subjective intent may be considered is that the 44A Claimants had constructive notice of the security agreements and involvement of GE Credit and Siemens.   <u>Black's Law Dictionary</u> defines constructive notice as:

> notice arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of, such as a registered deed or a pending lawsuit; notice presumed by law to have been acquired by a person and thus imputed to that person.

<u>Black's Law Dictionary</u> 1090 (8th ed. 2004).   In this case, the most obvious constructive notice is the UCC-1 financing statements that

- 21 -

GE Credit and Siemens filed with the North Carolina Secretary of State prior to any of the 44A Lien Claimants supplying materials or labor for the installation of the Metso or the Siemens Collateral. These UCC-1 filings put the 44A Claimants on notice that GE Credit and Siemens had a perfected security interest in the Metso and the Siemens Collateral and also provides additional evidence that the Debtor and the secured parties intended for the Metso and the Siemens Collateral to remain personal property upon annexation. Lundgren v. Mohagen, 426 N.W.2d 563, (N.D. 1988) (finding that the fact that parties filed a financing statement with the secretary of state rather than a fixture filing in the register of deeds was evidence of the parties' intention for personal property annexed to land to remain personal property).    Although the security agreements were not filed, the filing of a UCC-1 with the secretary of state put all third parties, including 44A Claimants, on notice that security agreements existed.  The 44A Claimants therefore are charged with knowledge of the terms of the security agreements, including the provisions giving GE Credit and Siemens the right to remove and sell the Metso and the Siemens Collateral upon the Debtor's default.  See Janss v. Pearman, 863 S.W.2d 643, 650 (Mo. App. S.D. 1993) (finding that purchaser with notice of unrecorded written lease had duty to investigate the terms of the lease and was charged with knowledge of such terms).

In summary, under North Carolina law, the controlling test for

determining whether personal property that is installed in a building by the owner of the building is the intention of the owner at the time of the installation.  In this case, the owner in question is the Debtor, the entity that owned the building and the equipment that was installed in the building.  The evidence offered at the trial rebutted the presumption that the Debtor intended for the equipment to enhance the value of the land and become part of the building and established that the Debtor intended for the equipment to remain personal property.  The result is that the Metso and the Siemens Collateral did not become fixtures, do not constitute improvements on real property within the meaning of N.C. Gen. Stat. § 44A-7(2) and do not constitute improvements on real property for purposes of N.C. Gen. Stat. § 44A-8.  It follows that the 44A Claimants are not entitled to 44A liens against the Metso or the Siemens Collateral or the proceeds realized from the Metso and the Siemens Collateral.  In reaching this conclusion, the court has taken into careful consideration the size of the Metso and the manner in which it was installed, factors that were emphasized by the 44A Claimants.  Undeniably, the Metso is a very large machine that required specialized and difficult installation measures. When in place, the Metso was more than 80 feet long and 23 to 24 feet high in some places.  Its size and tremendous weight required the use of cranes and rigging in order to unload the components, some of which weighed in excess of 70 tons, and to move those

components inside the building where they could be assembled on a reinforced floor. The installation involved affixing sole plates to the concrete floor with long anchor bolts and grout and attaching the Metso machine to the sole plates with bolts. At the same time, the evidence was undisputed that it was physically and economically feasible to disconnect the Metso, disassemble it and move it to another location where it could be re-assembled and used for the purpose for which it was designed. Also, to the extent that great effort went into attaching the sole plates to the floor and in aligning the machine with great precision, such efforts were undertaken in order to insure that the machine, once installed, would operate safely and effectively, and were not motivated by an intent to make the machine a permanent attachment to the building. While the evidence varied as to exactly how long it would take to remove the Metso, there was no credible disagreement about the fact that it could be done and that it would be economically feasible to do so. The contract price of the Metso when purchased in 2005 was $7,745,000. By the time of the trial in 2008, the price for a new Metso like the Debtor's machine had risen to some $13,000,000 and 12 months would be required before a new machine could be manufactured and delivered. The Metso incorporates the latest technology for the manufacture of tissue paper and still represents the state of the art for such machines. The evidence revealed that there is a strong market for used paper making equipment and parts,

- 24 -

including tissue machines, and that the demand for a used Metso would be particularly strong. These circumstances undoubtedly played a role in the Debtor's decision to purchase the Metso and in the willingness of GE Credit and Siemens to finance the purchase of the Metso and the intention of the Debtor that the Metso and the Siemens Collateral remain personal property despite the size and work involved in installing such equipment at the Debtor's facility.

II.  Were the Notices of Claim of Lien Filed Timely?

In addition to denying that the 44A Claimants supplied labor or materials for an improvement to real property, the Debtor and the other objecting parties contend alternatively that the 44A Claimants failed to file timely and proper notices of claim of lien and for that additional reason are not entitled to 44A liens.

Under N.C. Gen. Stat. § 44A-11, a 44A claim of lien on real property is perfected "upon the filing of the claim of lien on real property under G.S. 44A-12. . . ." It is undisputed that each of the 44A Claimants filed a notice of claim of lien and that each of the notices of claim of lien were filed with the Clerk of Superior Court of Richmond County, as required by subsection (a) of N.C. Gen. Stat. § 44A-12. The dates of the filing of the notices of claim of lien likewise are not disputed. Mechanical Supply filed its notice of claim of lien on March 7, 2007; American Stainless filed its notice of claim of lien on April 16, 2007; and Superior

filed its notice of claim of lien on June 6, 2007.  What is
disputed is whether these filings were timely, which requires an
examination of subsection (b) of N.C. Gen. Stat. 44A-12.  Under
this provision, claims of lien on real property must be filed "not
later than 120 days after the last furnishing of labor or materials
at the site of the improvement by the person claiming the lien."
Under this provision, the time for filing a notice of claim of lien
on real property runs from the date the claimant last furnished
labor or materials at the site of the improvement.  This means that
in order to determine whether the claims of lien filed by the 44A
Claimants were timely, the court must first determine when each of
the claimants last supplied labor or materials at the Cordova
facility for purposes of section 44A-12.

　　　　None of the 44A Claimants supplied their labor or materials on
a single occasion, nor do any of the 44A Claimants rely upon a
contract that required that a specified amount of labor or
materials be supplied at the Cordova facility.  Instead, it is
undisputed that each of the 44A Claimants supplied labor or
materials on a number of different dates extending over a period
of approximately thirteen months based upon various orders that
were placed by the Debtor during that period.  American Stainless
and Mechanical Supply contend that their contractual arrangement
with the Debtor was an open account that should be treated as a
single, continuing contract such that all materials were supplied

pursuant to a single contract in which the last furnishing was when they filled the last order submitted by the Debtor. Superior had a written contract and contends that all of the work it did was pursuant to that contract. These contentions are disputed by the Debtor and the objecting parties who dispute that American Stainless or Mechanical Supply had a single contract and contend that each order filled by them stands on its own for purposes of computing the 120-day limitation. The objecting parties contend that the services provided by Superior Crane other than installation of the Metso were performed pursuant to separate orders that likewise stand on their own for purposes of computing the 120-day deadline.

Because American Stainless and Mechanical Supply are both suppliers, their claims are similar and will be addressed first. Superior primarily performed services or supplied rental equipment and its claim involves some different issues that will be addressed separately.

A.  Contractual Relationship of American Stainless

American Stainless is a distributor of industrial piping with a place of business in Cheraw, South Carolina. It is strictly a supplier and does not provide installation services. The only products sold by American Stainless are piping and pipe fittings. Its products are a commodity rather than being custom made for customers.

The Debtor was a customer of American Stainless before American Stainless heard about the Debtor installing a new paper machine, and already had a credit line with American Stainless pursuant to which it purchased product on credit at a volume of $6,000.00 to $6,5000.00 per month. In approximately March of 2006, American Stainless learned that the Debtor was planning to install a new machine at its manufacturing facility and that the Debtor was requesting an increase in its credit line. At that point, American Stainless increased the Debtor's credit limit to $500,000.00, which was followed by a large increase in the volume of sales to the Debtor. American Stainless understood that the increased volume was for product related to a project involving the installation of a new machine at the Laurel Hill facility. American Stainless contends that its contractual relationship at that point was an open account. The court agrees.

An open account is a type of credit that is not unlike a line of credit. An open account results where the parties intend that the transactions between them are to be considered as a connected series, rather than as independent of each other, subject to a shifting balance as additional debits and credits are made, until one of the parties decides to close and settle the account. Woodruff v. Shuford, 346 S.E.2d 173, 175 (N.C. App. 1986); Noland Co., Inc. v. Poovey, 282 S.E.2d 813, 821 (N.C. App. 1981).

A lien claimant who supplies materials or labor for use in the

- 28 -

making of an improvement on real property is not barred from claiming a statutory lien merely because the contractual arrangement with the owner of the real property takes the form of an open account.  See Mutual Lumber Co. v. Gero, 244 A.2d 564, 567 (Me. 1968) ("use of the phrase 'open account' is not intended to mean that a material supplier is barred from claiming a lien merely because he maintains his principal book account in the form of a running account . . . [t]he test is rather whether or not the supplier furnished the materials for a particular building").  As with any other form of contract, the critical factor is that the materials or labor be intended for a particular improvement on real estate and not be sold on an open account for general use.  Id.; Layrite Products Co. v. Lux, 416 P.2d 501, 504-05 (Idaho 1966). The requirement under N.C. Gen. Stat. 44A-8 is that there be a "contract, either express or implied, with the owner. . . ."  The court concludes that the contractual arrangement embodied within an open account falls within this requirement and may serve as a basis for claiming a lien under section 44A-8.  Of course, a claimant still must satisfy the other requirements under section 44A-8 such as the requirement that the materials or labor sold on open account be intended for an improvement on real property, but the claimant is not disqualified from relief merely because the contract consists of an open account.

The contractual arrangement between American Stainless and the

Debtor as of March of 2006 when the Debtor's credit limit was
increased, falls within the definition of an open account. At that
point, the parties intended that there would be forthcoming
purchases related to the installation of a new paper machine at the
Cordova facility that would be handled as a connected series of
purchases and that a balance would be kept by adjustment of debits
represented by additional purchases and credits represented by
payments on account by the Debtor until the anticipated purchases
were completed or one of the parties decided to close the account.
Beginning on March 21, 2006, and continuing into October of 2007,
the Debtor ordered from American Stainless pipe and related
materials for use at the Cordova facility. These shipments were on
open account with 30 day terms. There was a sufficient
understanding between the Debtor and American Stainless that the
materials that were furnished after March 21, 2006, were intended
for a particular purpose, i.e., for use in the project involving
the installation of a new paper machine in the Debtor's plant in
Cordova, and not just for undesignated, general use.

In October of 2006, however, a change occurred in the
contractual relationship between American Stainless and the Debtor.
At that point, a sizable account balance had accumulated that was
past due and delinquent. An employee of American Stainless, Sam
Hancock, went to the Cordova facility to meet with Kent Hogan, the
Debtor's president, to discuss the delinquent account and whether

future deliveries would be made.  At that meeting, the parties reached an agreement regarding the amount of the existing account balance for unpaid invoices dated August 23, 2006, and before, which the parties agreed was $282,683.52.  The parties agreed that the indebtedness owing on such invoices would be converted to a promissory note, payable weekly at a fixed amount of $15,000.00, including interest at the rate of 9.5% per annum; that invoices for future deliveries would be on sixty day terms; that future shipments would be made, provided that the payments on the promissory note and for the future deliveries were current; and that Mr. Hogan would personally guarantee the debt owing by the Debtor to American Stainless.  Pursuant to this agreement, Mr. Hancock prepared a promissory note for execution by the Debtor and a guaranty for signature by Mr. Hogan.  The promissory note was signed and dated November 1, 2006, and the guaranty was signed by Mr. Hogan.  The promissory note ("Note") was in the original principal amount of $282,683.52, the amount owed on the open account for invoices dated August 23, 2007 and before, provided for interest on the unpaid balance at the rate of 9.5% per annum, and provided for payments to be made at a level rate of $15,000.00 per week, commencing November 8, 2006, and continuing weekly thereafter until the full amount of the promissory note was paid in full. Based upon this payment schedule, the date of the last and final payment under the Note was March 21, 2007.

- 31 -

It is well established in North Carolina that the acceptance by a supplier or contractor of a promissory note from the owner of real property may give rise to a waiver by the supplier or contractor of a lien otherwise available under the lien statutes even though the promissory note does not expressly provide for a waiver. See Miller v. Lemon Tree Inn of Wilmington, Inc., 249 S.E.2d 836 (N.C. App. 1978); Raeford Lumber Co. v. Rockfish Trading Co., 79 S.E. 627 (N.C. 1913). Whether a waiver occurs depends upon when the promissory note matures. If the note matures within the period for the perfection of a materialman's lien, no waiver occurs. Miller, 249 S.E.2d at 839. If the note matures after the expiration of the period for the perfection of the lien, waiver does occur. Id. See also Edmund T. Urban, North Carolina Real Property Mechanics' Liens, Future Advances, and Equity Liens, ¶ 9-2 at p. 62 (2d 1998) ("If the note says nothing about intent to waive except a recital of forbearance by C [contractor], and bears a maturity date outside of the 120-day claim of lien perfection period but within the 180-day enforcement period and is given by O [owner] to C prior to the filing of C's claim of lien, a waiver of lien will result, as the cases noted above indicate.").

A note matures when payment on the note comes due. In this proceeding in which the Note requires installment payments, and therefore has multiple dates on which payment is due, the parties disagree as to when the note matures. American Stainless argues

that the maturity date is the date the first installment becomes due, November 8, 2006. The Debtor argues that the maturity date is the date on which the last payment becomes due, March 21, 2007. If American Stainless is correct, then the Note matures within the 120-day claim of lien perfection period and does not constitute a waiver of the statutory lien provided for by Chapter 44A. However, if the Debtor is correct, the Note matures outside of the 120-day claim of lien perfection period and the Note does constitute a waiver of the statutory lien provided for by Chapter 44A. Both parties agree that the maturity date of a note is determined as of the date the note is executed.

As stated above, a note matures when payment becomes due. However, an entire note does not mature just because an installment payment becomes due. The note itself matures upon the date the entire principal balance becomes due and owing, not upon the date the first installment payment becomes due. See In re Castillian Apartments, Inc., 190 S.E. 2d 161, 161-62 (N.C. 1972) (finding that holder of deed of trust was not entitled to proceeds of foreclosure sale because note did not mature until the balance of the principal was due, absent any default in monthly installment payments); Watkins v. Farmers & Merchants Bank, 237 Fed. Appx. 591, 592 (11th Cir. 2007) ("The promissory notes . . . required 59 equal payments and a final, larger payment when the notes matured at the end of five years."); Cadle Co. v. Berkeley Plaza Assocs., No. 99-1908,

2000 WL 632471, at *1 n.1 (4th Cir. May 17, 2000) (stating that the note matured upon date that lump sum payment of the principal was due, not upon the date that the first monthly installment payment on interest was due). There is a sound reason for this conclusion. A note which requires one payment equal to the principal amount of the note plus any interest that accrues, matures on the date that the principal amount is due because the holder of the note cannot take any action to collect payment until the payment is actually due. An installment note allows an obligor to spread out principal and interest payments over time so that portions of the principal and interest become due prior to the date the entire balance becomes due. The fact that portions of the principal mature before the entire balance is due does not change the fact that a note matures when the entire principal balance becomes due. This is illustrated by the effect of an acceleration clause. Without an acceleration clause, the holder of the note has to sue on each individual principal and interest payment as it matures; the holder may not declare the entire note mature and demand payment of the entire debt upon default. An acceleration clause allows the holder to accelerate the maturity date of the note so that entire obligation, i.e. all principal and any interest accrued, becomes due immediately. The acceleration clause accelerates the due date of the entire balance owed under the note, the effect of which is to accelerate the maturity date of the entire note, thereby showing

that the maturity date of an installment payment is not equivalent to the maturity date of the note itself. The maturity date of a note is determined by the date that entire balance of the principal is due and owing. A maturity date, for purposes of whether a claimant has waived its 44A lien rights, is determined as of the date of the note's execution. Because the entire principal balance was not due and owing until March 21, 2007, that date was the maturity date of the Note at the time of execution. Therefore, American Stainless waived its 44A lien rights as to materials delivered prior to the execution of the Note because March 21, 2007, is outside of the 120-day claim of lien perfection period.

American Stainless argues that the presence of an acceleration clause compels the finding that the Note does not constitute a waiver because if the Debtor defaulted, American Stainless could accelerate the Note and declare the entire balance of the Note due and owing. Put another way, American Stainless argues that the acceleration clause in the Note allows for the possibility that the entire Note will mature within the 120-day claim of lien perfection period, and, therefore, the Note does not constitute a waiver. This argument is not persuasive. The presence of the acceleration clause in the Note does not change the fact that if the Debtor made every payment on time, the payment for materials delivered up to the time of the execution of the Note would be extended past the 120-day claim of lien perfection period. The fact that payment

extended past the 120-day claim of lien perfection period is more important to the waiver analysis than the possible acceleration of the debt before the expiration of such period. By allowing the payment to extend past such perfection period, American Stainless ceased to rely upon the statutory lien rights granted by Chapter 44A of the North Carolina General Statutes, and relied instead upon the credit of the Debtor and the Debtor's president, who personally guaranteed payment of the Note. The presence of an acceleration clause does not change this fact.

Finally, it should be noted that the Note provides the following with regards to pre-payment: "Borrower reserves the right to prepay this Note in whole or in part, prior to maturity, without penalty." This provision would make little sense if this court were to find that maturity is the date on which the first payment is due. The Note was executed on November 8, 2006, and the first payment on the Note was due November 18, 2008. If the maturity date was the first date a payment was due that would give the Debtor only ten days to pre-pay the Note. Considering that the Debtor was in dire financial straits when it executed this Note, it is very unlikely that this was the intent of the parties at the time of execution.

For the reasons detailed above, the court concludes that the maturity date of a note is the date on which the last payment on the note is due. In this proceeding, the maturity date of the Note

executed by the Debtor on behalf of American Stainless was March 21, 2007. Because the maturity date is outside of the 120-day claim of lien perfection period, American Stainless waived any statutory lien rights it had under Chapter 44A for the amount due for materials supplied prior to the execution of the Note.

The transaction that occurred in October of 2006 is legally significant for another reason. When the parties to an open account reach an agreement with respect to the transactions forming the open account, the new transaction is called an account stated. Little v. Shores, 17 S.E.2d 503, 504 (N.C. 1941) ("An account becomes stated and binding on the parties if after examination the party sought to be charged unqualifiedly approves of it and expresses his intent to pay it."); Woodruff v. Shuford, 346 S.E.2d at 175; and generally, 1 Am Jur 2d Accounts and Accounting § 26 (2005) ("An 'account stated' is broadly defined as an agreement, based on the prior transactions between the parties to an open account, that the items of the account are true and that the balance struck is due and owing from one party to another. . . . [T]here must be: (1) a showing of mutual assent, between the parties to the account, as to the correct balance, (2) a promise by one of the parties to pay the balance; and (3) a previous debtor-creditor relationship between the parties."). The transaction in October of 2006 involved an agreement as to the balance owed as of August 23, 2006, and included an agreement that the agreed upon

- 37 -

balance would be paid by the Debtor according to the terms incorporated into the promissory note that was signed at that time. As such, the transaction gave rise to an account stated.

Under North Carolina law, an account stated constitutes a new and independent cause of action that supersedes and merges the antecedent causes of action represented by the items that were included in the open account. Nello L. Teer Co. v. Dickerson Inc., 126 S.E.2d 500, 506 (N.C. 1962); Mahaffey v. Sodero, 247 S.E.2d 772, 774 (N.C. App. 1978). The account stated replaces the former open account that no longer exists once the account stated is agreed upon. Woodruff v. Shuford, 346 S.E.2d at 175 ("Any open account that may have existed between the parties thus merged into and was superseded by the account stated."). Thus, after the agreement in October of 2006 and the execution of the promissory note by the Debtor, there no longer was an open, running account as to the transactions that occurred prior to August 23, 2006. Instead, there was an account stated that replaced the former open account and, under the account stated, the last furnishing occurred on August 23, 2006, the date of the last invoice included in the account stated. Thus, absent the waiver of lien, American Stainless would have had 120 days from August 23, 2006, within which to file a notice of claim of lien for the amount owed on materials that were furnished prior to August 23, 2006. It is undisputed that the American Stainless notice of claim of lien was

filed on April 16, 2007, which was considerably more than 120 days after August 23, 2006.  Such filing would not comply with section 44A-12(b) as to materials furnished prior to August 23, 2006, and would be insufficient to perfect a lien as to any amounts owed for such materials even if American Stainless had not waived the right to claim a lien with respect to such materials.

American Stainless resumed shipping materials to the Debtor following the October agreement.  These shipments were according to new terms under which American Stainless agreed to ship to the Debtor on open account at net sixty days for as long as the payments required under the promissory note were made by the Debtor.  The contractual arrangement following the agreement in October was one in which the parties again contemplated a series of connected transactions involving purchases of materials for the project underway in Cordova which would be subject to a shifting balance as additional debits and credits were made until one of them decided to close and settle the account.  Such arrangement constituted an open, running account which should be treated as a single, continuing contract for the purchases that occurred after the previous closing of the account in October.  The unpaid balance owed on these purchases totals $284,236.23.  The last materials furnished pursuant to such open account was in February of 2007. Since the American Stainless notice of claim of lien was filed on April 16, 2007, it was filed within the 120 days allowed by section

44A-12 with respect to the materials furnished on open account subsequent to August 23, 2006, and is limited to $284,236.23.

B.  Contractual Relationship of Mechanical Supply

Mechanical Supply is a wholesale supplier of plumbing, pipe valves and fittings and is located in Matthews, North Carolina. It, too, is strictly a supplier and provides no installation or other services.  In approximately August of 2005, Mechanical Supply received an application from the Debtor for an open charge account and opened such an account for the Debtor.  In January of 2006, Mechanical Supply began receiving and filling orders from the Debtor.  These shipments were not related to a particular project. By the summer of 2006, the Debtor's account was overdue and Mechanical Supply terminated the Debtor's credit and closed the account.  However, in approximately October of 2006, a Mechanical Supply salesman visited the Debtor's facility, learned that the Debtor would be installing a new paper machine and had discussions with representatives of the Debtor regarding the Debtor possibly purchasing valves for the project from Mechanical Supply. Mechanical Supply then re-opened the Debtor's charge account in October of 2006.  Thereafter, during November and December of 2006, the Debtor ordered some 77 valves from Mechanical Supply that were installed at various locations in the Cordova facility where work related to various types of ancillary equipment was being performed.  The Mechanical Supply salesman visited the Debtor's

- 40 -

facility at various times while the installation of the new paper machine and the other work was underway and on some occasions was consulted by Debtor's personnel regarding which valves were needed for the work that was underway. The Debtor again fell behind in its payments, and Mechanical Supply stopped shipping to the Debtor in December, 2006, at which time Mechanical was owed $38,375.77.

The contractual arrangement between Mechanical Supply and the Debtor subsequent to October of 2006 when the account was reopened, falls within the definition of an open account. At that point, the parties intended that there would be forthcoming purchases related to the project at the Cordova facility that would be handled as a connected series of purchases and that a balance would be kept by adjustment of debits represented by additional purchases and credits represented by payments on account by the Debtor until the anticipated purchases were completed or one of the parties decided to close the account. During November and December of 2006, the Debtor ordered valves from Mechanical Supply for use in upgrading and supplementing ancillary equipment at the Cordova facility. These shipments were on open account with 30 day terms. There was a sufficient understanding between the Debtor and Mechanical Supply that such valves were intended for a particular purpose, i.e., for use in the work involving ancillary equipment that was underway at the Debtor's plant in Cordova, and not just for undesignated, general use.

Similar to American Stainless, the court concludes that the open account arrangement between the Debtor and Mechanical Supply is a sufficient basis for claiming a lien under 44A-8 and that Mechanical Supply is not disqualified from relief merely because the contract consisted of an open account.  The last materials furnished pursuant to such open account was in December of 2006. Since the Mechanical Supply notice of claim of lien was filed on March 7, 2007, it was filed within the 120 days allowed by section 44A-12 with respect to the materials furnished on open account subsequent to October of 2006.

C.  Contractual Relationship of Superior

Superior is a North Carolina corporation with its place of business located in Rockingham, North Carolina.  Superior provides crane rental and heavy rigging services, including moving and maintenance of heavy industrial equipment.  The operations of Superior are divided into two divisions, crane rental/rigging and trucking.  Superior did some earlier work at the Debtor's plant prior to the project involving the installation of the Metso and had some familiarity with the Debtor's facility.

In  November of 2005, the Debtor sought bids for the unloading and installation of the Metso. The exact scope of that work was described in a bid package which was made available to contractors who were interested in bidding on the work.  Superior was one of the bidders and submitted the bid chosen by the Debtor.  On or

about November 21, 2005, Superior submitted a proposed written contract to the Debtor which was signed and accepted by the Debtor on December 20, 2005 (the "December Contract").

Superior began work under the December Contract in December of 2005.  Using its equipment, Superior unloaded the various components of the Metso, moved the components into the building and assembled and installed the Metso, including aligning the machine as provided in the written contract. By the middle of May of 2006, the installation of the Metso had been completed and it was operating and producing paper.  At that point, the installation of the Metso was completed and Superior had completed the services described in the December Contract which Superior had agreed to perform for the contract price of $554,291.00.

The evidence showed that Superior continued to work at the Cordova facility after the installation of the Metso was completed. Such work was performed at other locations in Debtor's plant and involved other machinery and equipment in the Debtor's plant and included installation of additional equipment, working on existing equipment and various other services ("the Additional Work").  This Additional Work was very extensive and greatly exceeded the work and charges involved in the installation of the Metso.  This is illustrated by the fact that Superior was paid in excess of $3,000,000.00 for work performed at Debtor's plant and claims an additional $482,812.00 for a total of $3,482,812.00, and only

- 43 -

$554,291.00 of that amount was for the unloading and installation of the Metso.

There is a dispute regarding whether the Additional Work was performed pursuant to the December Contract or pursuant to some other contractual arrangement. Superior contends that all of the work was done pursuant to the December Contract, which is disputed by the objecting parties. Superior's contention that all of its work was covered by the December Contract is not supported by the evidence and is not accepted.

The first page of the December Contract refers to the document being a "Proposal and Contract" for "Installation of Metso Paper Machine" and specifies a total contract price of $554,291.00. The contract provides that Superior "offers to furnish all labor, specified materials and equipment required for the performance of the following described work." The contract then describes two items of work. Item No. 1 which is in the amount of $548,840.00 is described by reference to an attached proposal ("See detailed proposal dated 11/21/05") which consists of a letter from Superior to the Debtor that describes in detail the scope of work to be performed by Superior. The caption in the letter is "Proposal for installation of Metso Paper Machine at Laurel Hill Paper Company Rockingham Location" and the only work and materials described in the letter are work and materials directly related to the unloading and installation of the Metso. Item No. 2 in the contract is

- 44 -

described as "Optical Alignment Services Quote" and is in the amount of $5,451.00.

The foregoing provisions illustrate that the December Contract was a fixed amount contract for the work described which consisted of unloading, installing and aligning the Metso. The contract and the attached proposal make it clear that the work for which Superior was to be paid the fixed price of $554,291.00 was the installation of the Metso. The contract contemplated that the Metso work might be increased or decreased by incidental work and provided that any such work would be "set forth in writing on Superior Cranes' Change Order Form and signed by an authorized representative of the Customer prior to the making of such change." It is undisputed that there were no work changes that either increased the contract price or reduced it, and that no such change orders were ever prepared or signed. The contract price remained at the original $554,291.00.

It was recognized in the December Contract that Superior might perform work not pertaining to the contract. Regarding such unrelated work, the contract provided:

> NOTE: Other work done by Superior Cranes, Inc., at this site, during the term of this contract but not pertaining to this contract, will be handled as usual, using Superior Cranes Daily Reports and Superior Cranes' Standard Short Term Crane Rental Agreements. This "other work" will be billed using Superior Cranes Standard rates sheet in effect at the time the work is done.

The work performed by Superior in other parts of the Debtor's plant and involving equipment other than the Metso, was not part of the unloading and installation of the Metso, which was completed in May, 2005. Such other work did not pertain to the December Contract and was not treated as affecting the contract price specified in the December Contract. According to the evidence, the Additional Work was done pursuant to requests and specifications by Debtor's representative, Doug Bailey, who designed the work as it was requested. The charges for the Additional Work were based on Superior's daily reports and rental contracts which were supposed to reflect the men who performed the work, the number of hours they worked and the equipment that was provided by Superior. Such charges were invoiced to the Debtor sometimes on a weekly basis and sometimes less frequently than weekly depending on how busy the Superior personnel were. As early as April or May of 2006, the Debtor fell behind in paying Superior which prompted a meeting between the two companies. Pursuant to an agreement worked out at this meeting, the Debtor began paying Superior $50,000.00 per week and Superior agreed to keep working for the Debtor. This arrangement was not a part of the December Contract. Instead, it constituted an open account type of arrangement in which the parties treated the transactions involving the Additional Work as being a connected series that would continue as the Debtor upgraded or added other equipment in the plant with Debtor's liability being

a shifting balance as additional work was performed and billed and as payments were made by the Debtor.  Similar to American Stainless and Mechanical Supply, the court concludes that the open account arrangement between the Debtor and Superior is a sufficient basis for claiming a lien under section 44A-8 and that Superior is not disqualified from relief merely because the contract consisted of an open account.

The Additional Work supplied by Superior "outran" the payments being made by the Debtor and the Debtor fell further behind on its account with Superior as work continued.  In January of 2007, Superior received a $1,000,000.00 payment from the Debtor which brought the total payments to Superior to some $3,000,000.00. According to Superior, this left an unpaid balance of $482,812.09, a figure that is disputed by the Debtor.  This figure does not include any amount owed on the $554,291.00 specified in the December Contract.[4]  This means that the $482,812.09 being claimed by Superior is the balance allegedly owed on the Debtor's open account with Superior and that the 120-day period for filing a notice of claim of lien runs from the last date on which Superior supplied labor or materials for the Additional Work that was ordered by the Debtor as part of the continuing arrangement

---

[4]Claimants' Exhibit No. 25 contains a description of the work covered by the invoices identified by Superior as unpaid, and does not describe any of the Metso work.  Also, according to Superior's office manager, payments received by Superior were applied first to the oldest invoices which would have been the Metso invoices.

involved in the open account.

As previously noted, Superior filed its notice of claim of lien on June 6, 2007, which means that its last day of furnishing labor or materials had to be no earlier than February 7, 2007, in order to comply with the 120-day deadline contained in N.C. Gen. Stat. § 44A-12. Superior contends that the last date on which work or materials were supplied by Superior was February 7, 2007. This contention is contested by the objecting parties and there is a dispute in the evidence related to this issue, requiring a credibility determination by the court.

Superior produced and offered into evidence as Claimant's Exhibit No. 24, Superior invoice number 23117, dated February 7, 2007, addressed to the Debtor, and in the amount of $14,468.33, for equipment rental and labor charges that are itemized in the invoice. All of the charges contained in the invoice are for rental or labor charges on January 15, 16 and 17, 2007, except for two charges that are shown for February 7, 2007. The February 7 charges are $140.00 for a "17 Ton Boom Truck with Operator" and a $360.00 charge for a "Tractor/Lowboy" to "remove conveyor, Cordova, NC." The objecting parties deny that any such work was performed by Superior on February 7, 2007.

As the party asserting a 44A lien, Superior has the burden of proving by a preponderance of the evidence that the work described in the invoice as having been provided on February 7, 2007, i.e.,

- 48 -

removal of a conveyor, in fact, was supplied by Superior on that date.  Superior failed to carry this burden.  The invoice, itself, is lacking in credibility.  The practice followed throughout the project was for Superior to attach to its invoices copies of rental contracts and daily reports substantiating the charges shown on the invoices.  While invoice number 23117 has such supporting documents for the work listed for January 15, 16 and 17, no such documentation is attached for the work listed for February 7, and none was introduced at trial.  Also, the February 7 entry on invoice number 23117 was out of sequence in that there was a later invoice that contained charges for a date earlier than February 7.  No explanation was offered for this discrepancy.  Finally, the Debtor never received invoice number 23117 and there was no credible evidence that invoice number 23117 was mailed to the Debtor.

Nor was there any other evidence that was sufficient to establish that Superior performed work at Debtor's plant on February 7.  The Debtor offered credible testimony from Messrs. Bailey and Watkins that Superior was not asked to perform any work on February 7 and that no work was performed at Debtor's plant by Superior on that date.  The testimony of Messrs. Weatherford and Henry regarding whether Superior performed any work on February 7 was inconsistent and unconvincing.  Their testimony that large quantities of Superior's equipment was demobilized or removed on

February 7 likewise was lacking in credibility.  The itemization in invoice number 23117 of the work performed on February 7 does not include any entries for such demobilization and, in fact, the rental contracts attached to the invoice for the January 15, 16 and 17 charges suggests that demobilization occurred on those dates since these contracts refer to various cranes and materials being hauled from Debtor's plant back to Superior's equipment yard. According to the greater weight of the evidence, including the testimony of Mr. Bailey which the court accepts as credible and probative, the only activity by Superior on February 7, 2007, was the removal of several of its trailers containing building materials owned by the Debtor.  Whether these materials were taken as a form of self help by Superior is not clear, but it is clear that the removal of the materials was not done on the mistaken belief that the materials belonged to Superior or that Debtor had authorized the removal.  Further, although the removal of the building materials was not authorized by the Debtor, Superior refused to return the materials until after the Debtor instituted an adversary proceeding to recover the materials in May  of 2007.[5]

    In order for a date to be the last day on which labor was supplied for purposes of N.C. Gen. Stat. § 44A-12, the activity or work on that date must be "lienable."  See Edmund T. Urban, North Carolina Real Property Mechanics' Liens, Future Advances, and

_____

[5]Adversary Proceeding No. 07-02026.

Equity Liens, ¶ 5-3 (2d 1998) ("If it is not [lienable] and the claim of lien is filed after the statutory period, as computed from the date on which the last lienable item was furnished, the entire claim of lien will be invalid."). In order for work to be "lienable," the following criteria must be met: (1) the work performed and materials furnished must be required by the contract with the claimant and the owner; (2) the work or materials must have been furnished under one continuous contract; (3) whatever is done must be done in good faith for the purpose of fully performing the obligations of the contract; and (4) where the time allowed for filing has begun to run, the claimant cannot thereafter extend the time within which the lien may be filed by doing or furnishing small additional items for that purpose. Priddy v. Kernersville Lumber Co., 129 S.E.2d 256 (N.C. 1963); Blalock Elec. Co., Inc. v. Grassy Creek Dev. Corp., 393 S.E.2d 354 (N.C. App. 1990). Even if the contractual arrangement between the Debtor and Superior is treated as a continuous contract, the removal of the trailers containing Debtor's building supplies, Superior's only activity at Debtor's premises on February 7, is insufficient to constitute last work for purposes of N.C. Gen. Stat. § 44A-12 when measured against the foregoing criteria. The removal of the trailers containing the building supplies was not required under any aspect of the contractual arrangement between the Debtor and Superior. Additionally, Superior's removal of the trailers and materials was

- 51 -

not done in good faith.  As a result, February 7, 2007, is not the last day on which Superior supplied services or materials pursuant to its contractual arrangement with the Debtor.  Instead, the last day on which services or materials were supplied by Superior was some date earlier than February 7.  It follows that the notice of claim of lien filed by Superior on June 6, 2007, was not filed within the 120 days allowed under N.C. Gen. Stat. § 44A-12 and was insufficient to perfect a claim of lien pursuant to N.C. Gen. Stat. § 44A-11.

III.  Did the Claimants file Proper Notices of Claim of Lien?

During the course of the trial, an issue also arose regarding whether the 44A Claimants have complied with the content requirements of a claim of lien which are set forth in N.C. Gen. Stat. § 44A-12(c).  Specifically the issue relates to whether American Stainless and Superior complied with section 44A-12(c)(6) which requires that a claim of lien provide a "[g]eneral description of the labor performed or materials furnished."

In its notice of claim of lien, American Stainless described the materials it provided to Laurel Hill Paper Co. as follows: "stainless steel piping, tubing and fittings, valves, controls and process equipment which were incorporated into the plumbing/sewer/water system of the manufacturing plant operated by Laurel Hill Paper Co."  The description of the materials supplied as being pipes, valves and fittings is correct, but the description

of the use of those materials is not.  The materials were not used in the plumbing/sewer/water system of the manufacturing plant; they were used to provide connections to and between various items of machinery and equipment.

There is also an issue regarding the description of materials and labor contained in the claim of lien filed by Superior.  The description contained in Superior's claim of lien is as follows: "supplied labor and materials for installation of a machine paper, improving the debtor's real property."  This description is reasonably accurate as far as it goes, but arguably is incomplete since it does not refer to the Additional Work that was performed.

The court concludes that the descriptions contained in the claims of lien filed by American Stainless and Superior are sufficient to satisfy the requirements of section 44A-12(c)(6). Immediately following the claim of lien form contained in section 44A-12(c)(6), there is a provision that provides: "A general description of the labor performed or materials furnished is sufficient.  It is not necessary for lien claimant to file an itemized list of materials or a detailed statement of labor performed."  N.C. Gen. Stat. § 44A-12(c).  Prior to the enactment of Chapter 44A, former section 44-38 governed this issue.  That section required that all claims of lien "shall be filed in detail, specifying the materials furnished or labor performed, and the time thereof."  Thus, when Chapter 44A was enacted, the North Carolina

- 53 -

legislature significantly relaxed the level of specificity required
for the description of labor or materials in a 44A notice of claim
of lien.  This modification suggests legislative intent that a
general description is sufficient and that absolute accuracy is not
required as long as the description is not misleading.  This
conclusion finds support in the North Carolina cases.  The courts
of North Carolina consistently have stated that: "[T]here must be
substantial compliance with the [lien claimant] statute, i.e., a
statement in sufficient detail to put interested parties, or
parties who may become interested, on notice as to labor performed
or materials furnished . . . ." Mebane Lumber Co. v. Avery &
Bullock Builders, Inc., 154 S.E. 2d 665, 668 (N.C. 1967); Gaston
Grading and Landscaping v. Young, 449 S.E. 2d 475, 476-77 (N.C.
App. 1994); In re Alexander-Scott Group Ltd., No. 2:95-CV-672, 1996
WL 34363112, at *5 (M.D.N.C. May 20, 1996).  See also Lowery v.
Haithcock, 79 S.E. 2d 204, 207-08 (N.C. 1953).  The court is
satisfied that the descriptions contained in the claims of lien
filed by American Stainless and Superior substantially comply with
section 44A-12(c)(6) and are sufficient to put interested parties
on notice regarding the materials and labor supplied by American
Stainless and Superior.  While the description provided by Superior
referred only to installation of a paper machine, such reference is
sufficient to put parties on notice regarding the project that
included the installation of a paper machine and to provide notice

- 54 -

as to the other work provided by Superior in the course of that project. The American Stainless description provides a detailed listing of the materials it provided and, while the reference to "plumbing/sewer/water system" is not correct, the description is not misleading and is sufficient to put an interested party on notice regarding the materials supplied by American Stainless which were part of a piping system located within the Debtor's plant. Accordingly, the descriptions of materials and labor contained in the claims of lien of American Stainless and Superior are sufficient to satisfy the requirements of section 44A-12(c)(6).

IV.  Did the Claimants Comply with N.C. Gen. Stat. 44A-13?

The Debtor and the other objecting parties also contend alternatively that American Stainless and Mechanical Supply failed to comply with N.C. Gen. Stat. § 44A-13 and for that additional reason do not have an enforceable claim of lien.

Under N.C. Gen. Stat. § 44A-13(a) an action to enforce a claim of lien is required to be commenced with 180 days after the last furnishing of labor or materials by the claimant.[6] Where the real property at issue is not involved in a bankruptcy case, compliance with N.C. Gen. Stat. § 44A-13(a) involves the filing of an

---

[6]The pertinent language in N.C. Gen. Stat. § 44A-13(a) provides: "No such action may be commenced later than 180 days after the last furnishing of labor or materials at the site of the improvement by the person claiming the claim of lien on real property."

- 55 -

appropriate civil action to enforce the claim of lien in a district or superior court of North Carolina within the 180-day deadline.[7] The situation becomes more complex if a bankruptcy case is pending in which the automatic stay prohibits the filing of such a civil action.  In 2005, N.C. Gen. Stat. § 44A-13(a) was amended to address the situation in which there is a pending bankruptcy.  As amended, N.C. Gen. Stat. § 44A-13(a) provides:

> (a)  Where and When Action Commenced.-An action to enforce a claim of lien on real property may be commenced in any county where venue is otherwise proper.  No such action may be commenced later than 180 days after the last furnishing of labor or materials at the site of the improvement by the person claiming the claim of lien on real property.  If the title to the real property against which the claim of lien on real property is asserted is by law vested in a receiver or is subject to the control of the bankruptcy court, the claim of lien on real property shall be enforced in accordance with the orders of the court having jurisdiction over said real property.  The filing of a proof of claim with a receiver or in bankruptcy and the filing of a notice of lis pendens in each county where the real property is located within the time required by this section satisfies the requirement for the commencement of a civil action.

This provision provides an alternative means of satisfying the requirement of filing a state court action under N.C. Gen. Stat. § 44A-13(a) where the real property at issue is subject to the

---

[7]N.C. Gen. Stat. § 44A-13(a) provides: "An action to enforce a claim of lien on real property may be commenced in any county where venue is otherwise proper."

control of the bankruptcy court.  Under the alternative provided by this provision, a claimant may satisfy the requirement of commencing a civil action by filing a proof of claim in the bankruptcy court <u>and</u> by filing a notice of lis pendens in each county in which the real property is located within the time required under N.C. Gen. Stat. § 44A-13(a), i.e., within 180 days after the claimant's last furnishing of labor or materials.

It is undisputed that American Stainless and Mechanical Supply each filed a proof of claim in the bankruptcy court but did not file a notice of lis pendens in Rockingham County where the Debtor's real property is located.  The objecting parties contend that the failure to file a notice of lis pendens means that American Stainless and Mechanical Supply failed to comply with the requirement under N.C. Gen. Stat. § 44A-13(a) for the commencement of a civil action since they neither filed an actual civil action nor satisfied the alternative under section 44A-13(a) for doing so, and therefore do not have an enforceable claim of lien.   The objecting parties argue that the controlling language is contained in the last sentence of section 44A-13(a) and that such language contains a dual requirement, i.e., filing a proof of claim <u>and</u> filing a notice of lis pendens.  The court agrees with this reading of the statute.

American Stainless and Mechanical Supply argue that in this case, however, there should be no requirement for the filing of a

notice of lis pendens because the Debtor's real property was sold
before the time for filing a notice of lis pendens expired and that
the filing of a notice of lis pendens therefore no longer should be
required. A similar argument was rejected by the court in Lynch v.
Price Homes, Inc., 575 S.E.2d 543 (N.C. App. 2003). In Lynch the
plaintiff was a 44A claimant who had furnished labor and materials
for the improvement of real property. The real property was sold
at a foreclosure sale during the 180-day period following the
plaintiff's last furnishing of labor and materials. The plaintiff
purchased the property at the foreclosure sale and the dispute
involved conflicting 44A lien claims against the portion of the
foreclosure proceeds that exceeded the amount owed to the
foreclosing creditor. The plaintiff had the earliest furnishing
date and had filed a timely notice of claim of lien but had not
filed a civil action within 180 days from his last furnishing. The
plaintiff argued that as a result of the foreclosure sale, there
was no need or requirement for the filing of a civil action. In
rejecting this argument and holding that the plaintiff did not have
an enforceable lien, the court stated:

> Chapter 44A contains a framework for
> predictably ascertaining the result when
> disputes arise. We decline to create an
> exception to the clear language of the
> statutes set forth in Chapter 44A. With no
> prohibition against commencement of an
> enforcement action, petitioner's failure to
> commence such an action within the time
> required by the materialman's lien statutes
> prevents him from enforcing his lien.

- 58 -

575 S.E.2d at 546. Just as the sale of the real property in <u>Lynch</u> did not obviate the need for filing an action to enforce the claim of lien against the real property, the court concludes that in the present proceeding, the sale of Debtor's property did not obviate the need for filing a notice of lis pendens which, under the clear language of section 44A-13, is required to satisfy "the requirement for the commencement of a civil action." To hold otherwise, would be to create an unwarranted exception to the clear language of section 44A-13(a), a result that was expressly rejected in <u>Lynch</u>.

American Stainless and Mechanical Supply also argue that they were relieved of any requirement to file a notice of lis pendens as a result of an order that this court entered on April 27, 2007,[8] in response to the Debtor's motion to transfer liens, claims and interests to the proceeds to be realized from the sale of Debtor's assets. This argument is not supported by the record. It is clear that neither Debtor's motion nor the April 27 order addressed whether the 44A Claimants had valid and perfected liens or the manner in which 44A claims of liens should be enforced. In that regard, the order states:

> 9. The Debtor indicated that it was not requesting this Court to rule on the validity of the claims of lien asserted by the above creditors but was merely requesting that such claims of lien, to the extent of validity and perfection they may have, be transferred to the proceeds of sale in order to facilitate

[8]Docket Entry No. 257 in Case No. 07-10187.

the sale of the Debtor's assets pursuant to
the Sale and Auction Procedures Motion.

Nor does it appear that the April 27 order was regarded by the 44A

Claimants as establishing validity or procedures required for

perfection.  A motion[9] filed by American Stainless approximately a

month after the April 27 order was entered stated:

> 10.  Pursuant to North Carolina General
> Statute § 44A-13, American Stainless would be
> required to file its action on its Claim of
> Lien within "180 days after the last
> furnishing of labor or materials at the site
> of the improvement by the person claiming the
> claim of lien on real property."  In cases
> such as this, where "the title to the real
> property against which the claim of lien on
> real property is asserted is by law vested in
> a receiver or is subject to the control of the
> bankruptcy court, the claim of lien or real
> property shall be enforced in accordance with
> the orders of the court having jurisdiction
> over said real property.  The filing of a
> proof of claim with a receiver or in
> bankruptcy and the filing of a notice of lis
> pendens in each county where the real property
> subject to the claim of lien on real property
> is located within the time required by this
> section satisfies the requirement for the
> commencement of a civil action."  Id.
> Accordingly, American Stainless files this
> motion and will simultaneously file a notice
> of lis pendens in state court to satisfy the
> requirements of this statute."

Emphasis supplied.

---

[9]Motion to Enforce Lien Claim, Docket Entry No. 310 in Case
No. 07-10187.

This statement of intention to file a notice of lis pendens reflects that the April 27 order was not regarded as having created some alternative procedure that replaced the statutory procedure contained in section 44A-13 or as having removed the necessity of filing a notice of lis pendens pursuant to section 44A-13.

In summary, section 44A-13 specifies both the filing of a proof of claim and the filing of a notice of lis pendens in order for a claimant to satisfy the requirement under section 44A-13 for the commencement of an action to enforce a claim of lien. The result of the failure of American Stainless and Mechanical Supply to file the required notice of lis pendens is that they have failed to satisfy the requirement under section 44A-13 for the commencement of an enforcement action within 180 days after the last furnishing of labor or materials. As the court noted in Lynch, the effect of failing to commence a timely action to enforce a claim of lien is specifically addressed in N.C. Gen. Stat. § 44A-16(3). Under that provision, a claim of lien on real property is discharged "[b]y failure to enforce the claim of lien on real property with the time prescribed in this Article." N.C. Gen. Stat § 44A-16(3) As a result of the failure of American Stainless and Mechanical Supply to commence an action to enforce their claims of lien in any manner provided for in section 44A-13(a), their claims of lien have been discharged pursuant to section 44A-16(3). The claims of lien, having been discharged, are unenforceable and give

rise to no lien rights with respect to the proceeds realized from the sale of Debtor's assets.[10]

CONCLUSION

Based upon the foregoing findings and conclusions, the court has concluded that neither of the 44A Claimants has an enforceable lien against the proceeds realized from the sale of the Debtor's assets. An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

---

[10]There was no objection to Superior's claim based upon a failure to file a notice of lis pendens because Superior obtained an order on June 5, 2007, which provided that to the extent the filing of a notice of lis pendens was required under Chapter 44A, "the filing of the Claim of Lien is deemed to satisfy the requirement. . . ." Docket Entry No. 321.

SERVED ON ALL  PARTIES IN INTEREST