```
             UNITED STATES BANKRUPTCY COURT
           MIDDLE DISTRICT OF NORTH CAROLINA
                   GREENSBORO DIVISION
```

IN RE:                          )
                                )
Laurel Hill Paper Company,      )    Case No. 07-10187C-11G
                                )
        Debtor.                 )
                                )
_____ )
                                )
All Points Capital Corp.,       )
                                )
        Plaintiff,              )
                                )
v.                              )    Adversary No. 07-2040
                                )
Laurel Hill Paper Company,      )
et al.,                         )
                                )
        Defendants.             )
                                )

## MEMORANDUM OPINION

This adversary proceeding came before the court on April 15, 2008, for trial of a claim seeking relief pursuant to 11 U.S.C. § 552(b) as set forth in the Third Response in the Debtor's Answer, Counterclaim, and Crossclaim. Charles M. Ivey, III and James K. Talcott appeared on behalf of the Debtor, Gene B. Tarr appeared on behalf of von Drehle Corporation ("von Drehle"), John E. Zummo appeared on behalf of Siemens Financial Corporation, Frederick M. Thurman, Jr. appeared on behalf of the Unsecured Creditor's Committee (the "Committee"), and Kenneth M. Greene appeared on behalf of First Scotland Financial Corporation. Having considered the evidence offered and the arguments of counsel, the court finds and concludes that the Debtor is not entitled to relief pursuant to 11 U.S.C. § 552(b).

JURISDICTION

The court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(K) which this court may hear and determine.

FACTS

Prior to the filing of this bankruptcy petition, the Debtor's reputation, customer relations, and supplier relations were in extreme disarray as a result of severe financial difficulties experienced by the Debtor. In January of 2007, the Debtor hired Manfred Leong to help evaluate the business and determine whether the Debtor could restructure and continue its manufacturing operation located in Cordova, North Carolina. Mr. Leong was appointed the Chief Restructuring Officer ("CRO") a few weeks later. The CRO determined that a restructuring of the Debtor's debt was not feasible and recommended that the Debtor file bankruptcy. When the Debtor filed this case under Chapter 11 of the Bankruptcy Code on February 13, 2007, all operations had ceased, all employees had been laid off and the real and personal property located in Cordova, North Carolina ("Purchased Assets") were not part of an operating business. The relief sought by the Debtor was an orderly liquidation of its assets.

The CRO was able to get the cooperation of the employees needed in order to properly maintain and protect the Purchased Assets; was able to restore communications with former customers and suppliers in order to provide information regarding the status of Debtor's assets and the efforts to sell the assets; was able to keep in place the lease of a sludge farm needed as a waste disposable site for any leftover sludge that accumulated during Debtor's paper-making operations; and obtained a Phase I environmental report regarding Debtor's facility in Cordova. The CRO sought and communicated with potential purchasers and assembled appraisals and other information regarding the Purchased Assets which were made available to potential purchasers of the assets. These efforts were geared toward protecting the value of the assets by eliminating uncertainties that could adversely affect the price potential purchasers would be willing to pay, such as the condition of the assets, the availability of critical employees and vendors, potential environmental costs, and waste disposal.

On March 19, 2007, the Debtor filed a motion seeking authorization to sell the Purchased Assets to von Drehle. On May 17, 2007, an order was entered granting the Debtor's motion for approval of the sale of the Purchased Assets at a price of $22,700,000. The Debtor had scheduled the value of the Purchased Assets at $25,908,000. On May 29, 2007, the sale of the Cordova facility closed. After closing costs and the balance owed on a

post-petition DIP loan obtained earlier by the Debtor were paid from the sale proceeds, the Debtor received net proceeds of $21,965,868.27.

The assets that were sold pursuant to the May 17, 2007 order consisted of the Cordova real estate and buildings, the machinery and equipment at the Cordova facility, the inventory, machinery and equipment spare parts and supplies located at the Cordova facility and various vehicles and trailers owned by the Debtor. At the time of the sale, these assets were subject to various liens and encumbrances, which were transferred to the sale proceeds by the order authorizing the sale. There were some fifteen entities that held or claimed liens or security interests with respect to one or more of the assets that were sold and the aggregate amount of the secured claims filed by these claimants is greater than the $22,700,000 sale price received for Purchaser Assets. The parties to this proceeding include these secured claimants.

## DISCUSSION

The Debtor seeks to allocate $1,000,000 of the net sale proceeds to unsecured creditors pursuant to section 552(b). Debtor asserts that the proceeds received from the sale of the Purchased Assets were at least $1,000,000 greater than would have been paid absent the efforts of the CRO and that to allow the security interests of the secured claimants to attach to this enhancement in value would result in an inequitable windfall for the secured

claimants. Based on these assertions, the Debtor maintains that, pursuant to section 552(b)(1), the "equities of the case" are such that the court should order that the security interests of the secured claimants do not attach to $1,000,000 of the sale proceeds. The court does not agree.

Section 552, in pertinent part, provides:

> (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case;
>
> (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing, based on the equities of the case, orders otherwise.

11 U.S.C. § 552. Subsection (b) provides the only exception to the general rule that property acquired post-petition is not subject to a security interest created by a pre-petition security agreement. 11 U.S.C. § 552(a) & (b); H. Rep. No. 95-595, 95th Cong., 1st Sess. 376-77 (1977); See Sen. Rep. No. 95-989, 95th Cong., 2d Sess. 91

(1978). Pursuant to the exception carved out by subsection (b), if a pre-petition security agreement extends to proceeds of pre-petition property, then the proceeds of such pre-petition property continue to be subject to the security interest, unless the court finds, after notice and a hearing, that the "equities of the case" mandate a different result. 11 U.S.C. § 552(b)(1); H. Rep. No. 95-595, 95th Cong., 1st Sess. 376-77 (1977); See Sen. Rep. No. 95-989, 95th Cong., 2d Sess. 91 (1978); United Virginia Bank v. Slab Fork Coal Co., 784 F.2d 1188, 1191 (4th Cir. 1986) ("[A] bankruptcy court may choose not to apply a pre-petition security interest to post-petition proceeds 'based on the equities of the case.'").

It is undisputed that the description of collateral contained in the pre-petition security documents of the secured claimants in this case includes proceeds realized from the collateral described in the security documents and that such security interests therefore extend to the proceeds realized from the sale of the Purchased Assets unless the court orders otherwise based upon the equities of this case.[1] Thus, the only issue before the court is whether the court should order otherwise based upon the "equities" of this case.

---

[1] In Debtor's Third Response, Debtor argued in the alternative that the lenders' security interests never attached to $1,000,000.00 of the net proceeds because the $1,000,000 in net proceeds represents the value of goodwill, a post-petition asset not covered by the lenders' security agreements. Debtor abandoned this theory at trial.

The bankruptcy court has discretion in determining whether the "equities of the case" exception applies to a particular case. <u>Airport Inn Assocs. v. Travelers Ins. Co. (In re Airport Inn Assocs., Ltd.)</u>, 132 B.R. 951, 959 (Bankr. D. Colo. 1990). However, the legislative history to section 552 provides some guidance regarding the circumstances under which the exception applies:

> [Section 552(b)(1)] allows the court to consider the equities in each case. In the course of such consideration the court may evaluate any expenditures by the estate relating to proceeds and any related improvement in position of the secured party.

124 Cong. Rec. H 11,097-98 (daily ed. Sept. 28, 1978); S 17,414 (daily ed. Oct. 6, 1978).

> [T]he "equities of the case" provision . . . is designed, among other things, to prevent windfalls for secured creditors and to give the courts broad discretion to balance the protection of secured creditors, on the one hand, against the strong public policies favoring continuation of jobs, preservation of going concern values and rehabilitation of distressed debtors, generally.

140 Cong. Rec. H 10,768 (October 4, 1994).

> [The equities of the case exception] is designed to cover the situation where the estate expends funds that result in an increase in the value of collateral. The exception is to cover the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the funds available for general unsecured creditors.

H. Rep. No. 95-595, 95th Cong., 1st Sess. 376-77 (1977); <u>See</u> Sen.

Rep. No. 95-989, 95th Cong., 2d Sess. 91 (1978).

This legislative history has led courts to look at the following factors in determining whether the equities of the case exception is applicable: the amount of time and estate funds expended on the collateral, the position of the secured party, and the rehabilitative nature of the bankruptcy case. See Airport Inn Assocs., 132 B.R. at 959; Slab Fork Coal Co., 784 F.2d at 1191 ("It appears clear from the legislative history related to § 552 that Congress undertook in that section to find an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code.").

Because the Debtor filed this case to achieve an orderly liquidation rather than to reorganize, there is no rehabilitation at issue here and that factor carries no weight in this case. That leaves for consideration the amount of time and funds expended on the collateral and the relative position of the secured party after such time and funds were expended. Neither of these factors supports the Debtor's position.

The cases involving section 552(b)(1) appear to place the most weight on whether a debtor expended unencumbered funds of the estate, at the expense of the unsecured creditors, to enhance the value of the collateral. In re Tower Air, Inc., 397 F.3d 191, 205 (3rd Cir. 2005)(quoting In re Bennett Funding Group, Inc., 255 B.R. 616, 634 (N.D.N.Y. 2000) ("Section 552(b) is normally relevant in

a Chapter 11, 'to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee/debtor-in-possession's use of other assets of the estate.'"); In re Delbridge, 61 B.R. 484, 490 (Bankr. E.D. Mich. 1986)(quoting In re Crouch, 51 B.R. 331, 332 (Bankr. D. Ore. 1985))("'The purpose behind the 'equities of the case' rule of 11 U.S.C. § 552(b) is, in a proper case, to enable those who contribute to the production of proceeds during Chapter 11 to share jointly with pre-petition creditors secured by proceeds.'").

The "equity" of the case recognized in the foregoing decisions is not present in this case. At the outset of this case, the Debtor received DIP financing from Crestmark Bank that was used to pay the expenses incurred by the Debtor to provide security for the assets, to pay other ongoing expenses such as insurance premiums, power bills and the salaries of critical employees and to pay the expenses related to the sale of the assets, including the compensation and expenses of the CRO. The DIP Loan from Crestmark was repaid at the closing of the sale of the Purchased Assets from proceeds that were subject to the security interests of the various secured claimants whose liens had been transferred to the sale proceeds. The costs of the alleged enhancement thus were paid from encumbered funds and not from unencumbered funds of the estate. Payments at the expense of secured creditors rather than at the expense of the estate do not support an equities of the case award

to the unsecured creditors.  See In re Muma Services, Inc., 322 B.R. 541, 559 (Bankr. D. Del. 2005) ("In this case, neither the Debtors nor the Trustee invested any unencumbered funds available to the general unsecured creditors to enhance the value of the assets which were sold . . .  On the contrary, since all assets were the security of Bank Group, it was only through the use of the Bank Group's cash collateral (and the financing provided by Wells Fargo) that the estate was able to continue to operate and maintain the value of the assets.  Wells Fargo has been paid from the proceeds of the . . . sale.  The equities of this case do not support further eroding the Bank Group's collateral position under section 522(b)(1)."); Airport Assocs., 132 B.R. at 959 ("[T]he funds were not expended by the trustee or the debtor in possession from the assets of the bankruptcy estate.  Further, [Debtor] did not demonstrate that the funds were used to increase the value of [Debtor's] collateral to the detriment of unsecured creditors.").

Nor is this a case in which there were any tangible improvements to the secured party's collateral such as where estate funds are spent in order to convert raw materials into finished inventory that can be sold for more than the raw materials would have brought.  In the case at bar, no funds were spent to repair or otherwise make tangible improvements to the Purchased Assets.  In fact, when the Purchased Assets were sold in May of 2007, they were in essentially the same condition as when this case was filed three

months earlier.  What was done by the Debtor, through the CRO, was to preserve the Purchased Assets pending a sale, and to market and sale the assets in a manner that effectively exposed the assets in the market place.  Even if these efforts produced a higher sale price as asserted by the Debtor, such higher price does not in the court's view constitute an enhancement that would justify rearranging priorities and depriving the secured parties of any more of the sale proceeds.  As a debtor-in-possession, the Debtor had a duty to exercise its best efforts to preserve and protect the assets and to conduct any sale in a manner that would produce the maximum return.  Without a doubt, the Debtor and its CRO performed such duty in an exemplary manner.  This does not mean, however, that section 552(b)(1) should be invoked to reward the Debtor at the expense of the secured claimants.  Moreover, Debtor's primary motivation in conducting the sale of the Purchased Assets undoubtedly was the hope that the sale would produce more than the amount required to satisfy the secured claims.  In this sense, the Debtor was acting in its own best interest and the best interest of the estate.  The fact that the sale proceeds were less than hoped for, does not mean that the secured parties will be unfairly benefitted if they receive the entire net proceeds.  Under these circumstances, the court does not find that there is an equitable basis for depriving the secured parties of sale proceeds that they otherwise would be entitled to receive.  See In re Vanasdale, 64

B.R. 92, 97 (Bankr. N.D. Ohio 1986) ("To suggest, as the debtor does, that upon filing they had a right to . . . leave [lender] to its own devices to realize upon its collateral is an argument for recoupment of maintenance and enhancement expenses; it is no justification for denying [lender] its contractually granted rights . . . .").

The other factor discussed in the case law is the relative position of the secured party following the expenditure of time and money by the debtor or the trustee.  This issue is closely related to whether the value of the secured creditor's collateral is enhanced at the expense of the estate, and is usually framed in terms of whether the circumstances are such that allowing the security interest of the secured creditor to attach to proceeds from the collateral would constitute a windfall.  In re Tower Air, Inc., 397 F.3d 191, 205 (3rd Cir. 2005) ("While the pre-petition repairs to the engine did increase the value of [the] collateral, . . . [Creditor] [was] left greatly undersecured.  Thus, [Creditor's] recovery here hardly constitutes a windfall.  Instead, [Creditor] will simply recover what it is due as a secured creditor with a valid security interest in the insurance proceeds.").  In this case, the secured claimants will receive only what they are due pursuant to their security agreements, none of which will come at the expense of the Debtor or the estate.  Such a result does not constitute a windfall for the secured claimants nor create an

equitable consideration that would warrant further reducing the distribution called for under the perfected security interests in this case.

## CONCLUSION

Neither the factors listed in the legislative history to section 552, nor the factors discussed in the case law relating to section 552, support Debtor's assertion that the "equities of the case" exception found in section 552(b)(1) applies in this case. Therefore, the relief requested by the Debtor in its Third Response shall be denied. An order so providing is being entered contemporaneously with the filing of this memorandum opinion.

This 19th day of August, 2008.

_____
WILLIAM L. STOCKS
United States Bankruptcy Judge